IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs June 19, 2002

## STATE OF TENNESSEE v. MARK A. GRIFFIN

**Direct Appeal from the Criminal Court for Anderson County**
**No. 99CR074B     James B. Scott, Jr., Judge**

---

**No. E2001-02006-CCA-R3-CD**
**January 22, 2003**

---

The appellant, Mark A. Griffin, was convicted by a jury in the Anderson County Criminal Court of first degree murder committed in the perpetration of an aggravated robbery and was sentenced to life imprisonment without the possibility of parole. On appeal, the appellant raises several evidentiary questions, contests the jury charge, and challenges the sufficiency of the evidence supporting his conviction. Upon review of the record and the parties' briefs, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which DAVID H. WELLES, J., joined. GARY R. WADE, P.J., concurring in results only.

Mart S. Cizek, Clinton, Tennessee, for the appellant, Mark A. Griffin.

Paul G. Summers, Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; James N. Ramsey, District Attorney General; and Jan Hicks, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I. Factual Background

On March 2, 1999, an Anderson County Grand Jury indicted the appellant on one count of first degree murder committed in the perpetration of an aggravated robbery. The indictment arose from the murder of Fred Brown in Clinton on February 17, 1999. The guilt/innocence phase of the trial resulted in the appellant's conviction of first degree murder. At the conclusion of the sentencing phase, the jury imposed a sentence of life imprisonment without the possibility of parole, finding that the murder was knowingly committed or aided by the appellant while he had a substantial role in committing a robbery and that the appellant had been previously convicted of aggravated robbery and attempted aggravated robbery.

At trial, the State first presented the testimony of the victim's wife, Geneva Brown. Geneva Brown testified that her husband, Fred, was a former Tennessee State Trooper and electrician. On February 17, 1999, the victim was working at his used car lot, F&G Auto Sales, which was located on Clinch Avenue in Clinton. The victim also owned a one-half interest in Mid-South Auto Auction and frequently purchased used cars for the businesses. He usually paid cash for the cars and accordingly kept large sums of money in his possession. Geneva Brown cautioned the victim about carrying such large sums of cash, but "he didn't take it seriously." However, in response to his wife's concerns, the victim began placing a small amount of money in his shirt pocket with a larger amount of cash rolled up in the pocket of his pants. The victim also placed a video camera in the car lot's office in order to record the activities on the parking lot.

Geneva Brown last saw her husband alive on February 17, 1999. On that day, in response to a telephone call, she went to the car lot, arriving as emergency personnel were taking the victim from the office. Although she was unable to speak with the victim, she heard "muffled sound" and noticed that he was moving. After the victim's death, police returned to her approximately six thousand dollars which they had found in a roll in her husband's pants pocket.

Sometime before trial, Ronald Austin spoke with the appellant regarding the offense. At trial, Austin testified that the appellant told Austin that he was charged with "shooting an ex-cop." According to Austin, the appellant and another individual were together and "in the context of it the guy got shot." The appellant related that the other individual was caught and "he tried to put everything on [the appellant]."

Wendy Carroll lived next door to F&G Auto Sales. She knew the victim and would occasionally chat with him. On the day of the offense, at approximately 5:30 p.m., the attendant from the car lot came to her house and told her that the victim needed an ambulance. Carroll did not know the attendant's name but knew that he worked at the car lot. The attendant "acted dazed, confused, rambling," and Carroll noticed a knot on the back of his head. Initially, Carroll thought that the victim had experienced a heart attack. Carroll did not have a telephone in her home. Accordingly, she immediately went to the car lot office where she found the victim "laying in the corner of the business." Carroll identified herself and told the victim that he had been shot. When she asked the victim if he knew the identity of his attackers, he responded that he did not know who they were, but related that the attackers were black. Carroll did not immediately realize the severity of the victim's injuries. She noted that "[o]n his face, one of his eyes, the cornea of his eye- it was, it looked like it had been torn off or partially torn off." Carroll's twelve-year-old son, who had accompanied her to the office, called for assistance.

Jason Taylor, a firefighter and emergency medical technician, responded to the 911 call from F&G Auto Sales. Taylor explained that the initial report indicated that the problem was related to chest pains. However, upon arrival he was advised that the owner of the business had been shot. Taylor immediately called the Clinton Police Department. Taylor testified that the victim was found lying behind a desk. He had two gunshot wounds, one on the left chest and one "towards the neck." The victim was conscious and informed Taylor that he had been shot with a small caliber

weapon. The victim also advised Taylor that his attackers had left the scene. Taylor noted that blood was coming from the victim's chest wound as well as from his mouth and nose. The victim was having trouble breathing and was placed on oxygen. In order to treat the victim, his clothing was removed and left on the floor of the office.

Scott Campbell, a paramedic with the Anderson County Ambulance Authority, also responded to the 911 call at F&G Auto Sales. When Campbell arrived, the Fire Department, the Clinton Police Department and the Anderson County Sheriff's Department were already on the scene. Campbell saw the victim lying behind a desk and noticed that he had several gunshot wounds. Campbell helped cut the victim's clothing from his body and confirmed that the clothing was left at the scene. The victim was transported to Lakefront Park in Clinton to await the arrival of the Lifestar helicopter. Campbell related that the victim had blood in his mouth and was having difficulty breathing. Campbell testified that the Lifestar helicopter was landing as they arrived at the park with the victim.

Mike Norris was a nurse onboard the Lifestar helicopter on February 17, 1999. The helicopter arrived in Clinton at approximately 6:02 p.m. Norris explained that due to the nature of the victim's injuries "[w]e were going to plan on hot loading the victim. In other words, we weren't going to shut the aircraft down." When Norris saw the victim, the victim "was in respiratory, cardiac arrest, or he was eventually heading in that direction." According to Norris, the victim was not getting oxygen into his system. Norris noticed areas of injury to the victim's face, the right neck and the right chest. Also, "there was a lot of contusions, abrasions, some swelling, depressions." The victim remained unconscious during the flight. When the flight landed, approximately eight minutes after take-off, the victim showed no signs of life; specifically, he had no heart rate or blood pressure. Dr. Blaine Enderson of the University of Tennessee Medical Center pronounced the victim dead on arrival at the hospital.

On February 17, 1999, Bobbie Riggs was living at 2740 West Wolfe Valley Road in Anderson County. When Riggs arrived home at approximately 5:30 p.m., she found a video tape in her driveway. Riggs noticed that the tape appeared to be broken. She took the tape into the house and placed it on a counter. Later that evening, Riggs discovered that the police were searching for a video tape that was missing from F&G Auto Sales. Riggs called the home of her neighbor, Avery Johnson, who was employed with the sheriff's department. Riggs spoke with Johnson's wife who called police. Shortly thereafter, an officer was dispatched to Riggs' home to retrieve the video tape. Riggs testified that she did not attempt to play the video tape and relinquished it to police exactly as she found it.

Officer Rick Scarbrough, an officer with the Clinton Police Department, testified that at approximately 8:00 p.m. on February 17, 1999, he went to Riggs' residence to obtain a video tape. Officer Scarbrough testified that he became involved after receiving a telephone call from Judy Johnson. After obtaining the video tape, Officer Scarbrough placed it in a brown paper bag and took it to Assistant Chief David Queener of the Clinton Police Department. Assistant Chief Queener instructed Officer Scarbrough to take the video tape to the Movie Station, a movie sales and rental

business. Janine Starnes, an employee of Movie Station, repaired the video tape. Officer Scarbrough observed Starnes remove the video tape from the damaged casing, cut approximately one-half inch of the video tape from either side of a tear in the video tape, splice the tape back together, and wind it into a new casing. After the repairs, Officer Scarbrough returned the video tape to Assistant Chief Queener.

Officer Donald McClendon of the Knoxville Police Department testified that on February 17, 1999, he participated in the arrest of the appellant at the appellant's home on Valley View in Knox County. Officer McClendon explained that the officers entered the appellant's residence, obtained custody of him, and placed the appellant in the back of the police cruiser. At the time of the appellant's arrest, the appellant's girlfriend and her daughter were also in the home. While in the cruiser, the appellant told the officers that he was cold and asked for his coat. The officers asked the appellant's girlfriend to go back into the residence and get the appellant's coat. However, after the girlfriend obtained the coat, Officer McClendon did not give the coat to the appellant. At trial, he explained that it was warm inside the cruiser and the appellant did not need the coat. Officer McClendon maintained that the officers were attempting to accommodate the appellant. Officer McClendon stated that they "were not in the business of being harsh or mean to anybody. It's his coat. He wanted to take it with him. . . . So we accommodated him and got his coat." The coat was placed in the trunk of the police cruiser. Officer McClendon recalled that upon arrival at the police department, "[W]e were taking it back up to be put in [appellant's] properties. As we walked in, we ran into Mr. Douglas and some other officer . . . so in turn we turned this coat over to them."

On February 17,1999, Robbie Phillips was employed as a mechanic at F&G Auto Sales. He had worked for the victim for approximately one year. Phillips testified that the victim had a video camera in the window of the office and also a television which allowed them to monitor activity on the car lot. The video tapes were changed daily. On the day of the offense, at approximately 4:00 to 4:30 p.m., Phillips looked out the glass door of the office and observed two black men looking at a red Ford car. One man was wearing a black jacket and the other man was wearing a green jacket. Shortly thereafter, the men came into the office. The man in the black jacket approached the victim while the man in the green jacket approached Phillips. The man in the black jacket advised the victim that "it was a robbery." Phillips was then struck twice, once in the right eye and once on the back of his head, rendering him unconscious.

When Phillips regained consciousness, he was lying on the floor with his hands bound behind his back with duct tape. The victim, who was lying on the floor behind the desk, told Phillips that he had been shot, and asked Phillips to call 911. Realizing that the office telephone had been jerked from the wall, Phillips ran next door for assistance. He then returned to the office with Carroll.

Phillips testified that he had watched the video tape of the offense and had also listened to the audio which was recorded inside the office.[1] Phillips identified the voices on the tape as his own, that of the victim, and the perpetrators. He had never heard the voices of the perpetrators prior to the day of the offense. Phillips said that the victim had been to the bank earlier in the day and that the victim carried cash in his shirt pocket. Phillips identified the appellant and Joe Gallaher. At trial, Phillips identified the appellant as the perpetrator who hit the victim.[2]

Dr. Cleland Blake performed the autopsy on the victim on February 18, 1999. Dr. Blake concluded that the cause of death was "aspiration asphyxia." At trial, he testified that the victim had sustained two gunshot wounds. "One of [the wounds] was clearly not lethal and one would have been lethal had he not suffered severe injuries to his face which caved in the left side of his facial bones and broke vessels going into the sinuses." The "nonlethal" bullet entered around the right side of the victim's neck and came out just above the breast bone. The second bullet entered the chest near the right nipple, traveled down through the chest and abdomen, "causing gradual bleeding into the abdomen," and eventually "came to rest over the hip bone." This wound, left untreated, would have been fatal. However, death was actually caused by "severe injuries to his face which caved in the left side of his facial bones and broke vessels going into the sinuses." The facial wounds resulted in the victim "aspirating, sucking the blood from his caved[-]in face down into his bronchial passages into his lungs causing asphyxia or failure to get oxygen." Essentially, the victim choked to death on his own blood. Dr. Blake opined that the facial wounds were caused by

> a broad heavy or flat object. These are not inflicted by fists. They are not inflicted by, I don't think that they are the butt of a gun unless it's a very broad butt of a gun. It could have been a piece of timber. Some of these could have been inflicted by crashing into a table, a wall, a piece of furniture, or indeed the floor, but . . . a simple fall did not cave in the left facial bones and cause the hemorrhage which bled into that.

At the time of trial, David Queener was the Assistant Chief of the Clinton Police Department. On February 17, 1999, Assistant Chief Queener was a Captain in charge of the Patrol and Detective Division of the Clinton Police Department. He testified that he had known the victim for approximately fifteen years and was familiar with his voice. Prior to the date of the offenses, he did not know Phillips. However, he did know the appellant and Gallaher and was familiar with their voices. After listening to the voices on the tape, Assistant Chief Queener recognized the voices of Gallaher and the appellant as those of the perpetrators. Assistant Chief Queener also determined after viewing the video tape that the appellant entered the office first and was wearing a green jacket; Gallaher followed the appellant into the office and was wearing a black jacket. Assistant Chief Queener maintained that Phillips was mistaken in stating that the appellant wore a black jacket during the offense.

---

[1] This video tape was not included in the record for our review.

[2] Gallaher was also indicted in this offense, but was not tried in the instant case.

Assistant Chief Queener later requested that the Knox County Police Department compile computer-generated photographic line-ups, specifically asking that photographs of Gallaher and the appellant be included. Two line-ups were created; one for the identification of Gallaher and one for the identification of the appellant. A computer randomly placed both Gallaher and the appellant in the number two position. Assistant Chief Queener asserted that because the line-ups were generated by a computer located at the Knox County Police Department, he was unable to change the position of either man. From these line-ups, Phillips positively identified Gallaher and the appellant as the perpetrators. Additionally, Assistant Chief Queener noted that the video tape revealed that the perpetrators drove a 1979 yellow Mercury automobile to the car lot. The car shown in the video tape was registered to Daphene Crowley.

George Wilson testified that he also worked at F&G Auto Sales. Through various familial relations, Wilson was acquainted with Gallaher and the appellant. Both men had been to Wilson's home on various occasions. Wilson believed that Gallaher and the appellant were cousins because they typically called each other "cuz." Wilson viewed the video tape and identified the 1979 Mercury on the tape as the vehicle that Gallaher was driving at the time of the offenses. From the video tape, Wilson recognized Gallaher and the appellant as the perpetrators. Moreover, he positively identified their voices after hearing them call each other "cuz" on the tape. Wilson also related that the victim normally carried around one hundred dollars ($100) in his shirt pocket and also carried money in his pants pocket.

Billy Paul Brown testified that he, Gallaher, and the appellant were cousins. On February 22, 1999, Gallaher was arrested at Billy Paul Brown's trailer. The black jacket seized by the police belonged to Gallaher. Billy Paul Brown stated that Daphene Crowley was Gallaher's girlfriend. Moreover, after reviewing the video tape he recognized the voices and faces of Gallaher and the appellant as the perpetrators.

Eldridge Douglas testified that, prior to his retirement in October 1999, he was a detective with the Clinton Police Department. Douglas had known the victim, the appellant, and Gallaher for years. Initially, Douglas was in charge of the investigation of the robbery and shooting of the victim. He was called to the scene and noticed that Phillips appeared to have been hit with something. Douglas ultimately retrieved a roll of six thousand dollars ($6000) from a pocket of the victim's pants. On February 17, 1999, after viewing the tape, Douglas visually identified Gallaher as one of the perpetrators. He also recognized the voices of the victim, Gallaher, and the appellant. Specifically, Douglas stated that "I had talked to [the appellant]. But the day that we went to . . . interview him, I was absolutely positive that it was his voice."

Douglas explained that he obtained a black jacket that was in Gallaher's possession when he was arrested. Additionally, when Douglas saw the green jacket in the possession of the Knoxville officers, he recognized it as the one worn by the appellant during the robbery and took possession of the jacket.

Finally, Richard Whitt, an officer with the Clinton Police Department, testified that he was well-acquainted with Gallaher and the appellant and knew that Gallaher and the appellant were cousins. When Whitt viewed the video tape for the first time on the day after the shooting, he recognized Gallaher and the appellant. He also recognized the appellant's voice. Furthermore, Whitt noted that the appellant entered the office first and was followed by Gallaher. Whitt maintained that the transcript of the video tape accurately reflected the proceedings on the video tape. Moreover, Whitt was aware that Gallaher and the appellant frequently called each other "cuz"; however, Whitt conceded that the term is frequently used among friends and relatives.

Following his conviction the appellant timely appealed, raising the following issues: (1) whether the trial court erred in allowing the State to introduce testimony of a witness whose identity was not revealed to the defense in compliance with discovery rules; (2) whether the trial court erred in allowing the State to introduce into evidence a video tape and purported transcript of the video tape of the alleged crime and whether the court erred in allowing the State to introduce testimony of witnesses who testified that they recognized the voice of the appellant; (3) whether the trial court erred in failing to suppress the jacket seized from the residence of the appellant; (4) whether the trial court erred in failing to suppress the suggestive photo line-up; (5) whether the trial court erred in failing to charge the jury with the lesser-included offense of facilitation of first degree murder committed in the perpetration of an aggravated robbery; and (6) whether the evidence was sufficient to support the appellant's conviction for first degree murder committed in the perpetration of an aggravated robbery.[3]

## II. Analysis
### A. Suppression of Evidence

The appellant contends that the trial court erred in denying his motions to suppress evidence. Findings of fact made by a trial court during an evidentiary hearing on a motion to suppress must be given the weight of a jury verdict and an appellate court need not set aside the trial court's findings unless the evidence preponderates against them. State v. Jackson, 889 S.W.2d 219, 222 (Tenn. Crim. App. 1993). Questions of the credibility of witnesses, the weight and value of the evidence, and the resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). However, this court will review the trial court's application of law to the facts purely de novo. State v. Walton, 41 S.W.3d 75, 81 (Tenn.), cert. denied, 534 U.S. 948, 122 S. Ct. 341 (2001). Moreover, "in evaluating the correctness of a trial court's ruling on a pretrial motion to suppress, appellate courts may consider the proof adduced both at the suppression hearing and at trial." State v. Henning, 975 S.W.2d 290, 299 (Tenn. 1998).

### 1. Jacket

The Fourth Amendment to the United States Constitution provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause." Likewise,

---

[3] We will address the appellant's issues in a different order than they were raised in the appellant's brief.

Article 1, section 7 of the Tennessee Constitution provides that "the people shall be secure in their persons, houses, papers and possessions, from unreasonable searches and seizures." In relation to this issue, our supreme court recently noted:

> It is well settled that the Fourth Amendment's procedural safeguards do not apply to police investigative activities unless those activities constitute a "search" within the meaning of the Fourth Amendment. Since Katz v. United States, 389 U.S. 347, . . . , 88 S. Ct. 507 (1967), the Supreme Court has declined to define the term "search" in a literal fashion, and it has instead chosen to define a search as an invasion of a reasonable or legitimate expectation of privacy.

State v. Ross, 49 S.W.3d 833, 839 (Tenn. 2001) (citation omitted).

In the instant case, the appellant maintains that the trial court erred by finding that the jacket seized from his residence was not obtained as the result of an illegal search. At the suppression hearing, Officer Robert A. Soloman and Officer Donald McClendon testified that they were present when the appellant was arrested on February 26, 1999. After the appellant was taken into custody and placed in the back of the police cruiser, the appellant asked for his jacket because he was cold. As a result of the appellant's request, the officers asked the appellant's girlfriend to retrieve the appellant's jacket from inside the residence. After being given the jacket by appellant's girlfriend, Officer McClendon searched the jacket and discovered a bottle of pills in a pocket. Further investigation revealed that the appellant had a valid prescription for the pills. However, the jacket was not given to the appellant but was placed in the trunk of the police car. When asked why the appellant was not given the jacket, Officer McClendon explained:

> Well, sir, he was in handcuffs. We weren't making it convenient. We just gave him his jacket. And if he wanted his jacket down the road and they wanted to give it back to him, it was his jacket. He didn't need a jacket in the car, because it was warm. And we weren't going to unhandcuff him. We just made it convenient to him to get him his jacket.

Thereafter, the officers took the jacket to the Knox County Intake Center to be placed with the appellant's personal effects. Upon arrival, they met two investigators from the Clinton Police Department who took possession of the jacket. At trial, Douglas, who was one of the investigators, testified that he immediately seized the jacket upon seeing it because after viewing the video tape he recognized that it was "obviously worn in the robbery." At the suppression hearing, the appellant denied that he was cold on the day of his arrest and further denied that he asked the officers for his jacket. Instead, the appellant claimed that while he was in the back of the police cruiser he witnessed the officers go into his home and return with the jacket.

Based upon this evidence, the trial court found that "the jacket came into police custody in a lawful manner and not as a result of a search." The record reflects that the credibility of the witnesses was the determinative factor. Obviously, the trial court accredited the testimony of the officers. The evidence does not preponderate against the trial court's findings. Based upon the testimony of the officers, no search took place. The appellant did not have a reasonable expectation

of privacy in a jacket that he specifically asked the officers to retrieve. The appellant asks this court to "infer" another motive for the retrieval of the jacket. However, the trial court is the trier of fact, not this court. Odom, 928 S.W.2d at 23. The appellant is not entitled to relief on this issue.

## 2. Pretrial Identification

The appellant also contends that the trial court erred in failing to suppress the photographic line-up, summarily complaining that it was suggestive. We note that the appellant has not included the line-ups in the record for our review, thus waiving this issue on appeal. Tenn. R. App. P. 24(b). Regardless, this issue is without merit.

"The rule is that constitutional due process is violated if a pretrial identification is influenced by suggestiveness by police officers to such degree as to render the identification unreliable." State v. Shanklin, 608 S.W.2d 596, 598 (Tenn. Crim. App. 1980). Tennessee courts have adopted the five factors suggested in Neil v. Biggers, 409 U.S. 188, 199-200, 93 S. Ct. 375, 382 (1972), for use in determining whether an identification is sufficiently reliable to withstand a due process attack despite a suggestive lineup:

> (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty of the witness at the confrontation; and (5) the length of time between the crime and the confrontation.

Shanklin, 608 S.W.2d at 598; see also Bennett v. State, 530 S.W.2d 511, 514 (Tenn. 1975). "'Convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photo identification was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.'" State v. Philpott, 882 S.W.2d 394, 399 (Tenn. Crim. App. 1994) (quoting Simmons v. United States, 390 U.S. 377, 384, 88 S. Ct. 967, 971 (1968)). However, if a court using the Biggers standard determines that a pretrial confrontation was so impermissibly suggestive that it violated an accused's right to due process, both the out-of-court and the in-court identifications are excluded. Shanklin, 608 S.W.2d at 598.

In the instant case, Phillips testified at the suppression hearing that even though the offense was committed in February, the police did not contact him to view a line-up until September. Assistant Chief Queener asserted that the line-ups containing Gallaher and the appellant were generated by computer. He explained that "I found it's better to let the computer pick it out. It gets a whole lot closer than me trying to pick it out. That and the fact that you have color photographs and you have black-and-white photographs, and it's just hard to get a photograph being the same." The computer program placed Gallaher's picture in the second position in his line-up and the appellant's picture was also placed in the second position in his line-up. Assistant Chief Queener did not know "why they both spit out No. 2. It's the way the computer done it."

Before showing Phillips the line-ups, Assistant Chief Queener advised Phillips that he needed to be "a hundred percent sure" of his identification. Within approximately one minute,

Phillips examined the line-ups and identified Gallaher and the appellant as the perpetrators. See Philpott, 882 S.W.2d at 400. In response to the appellant's questioning at the suppression hearing, Phillips admitted that in February he told the police that he could identify only one of the perpetrators. The record is not clear as to which perpetrator Phillips could identify. However, he explained that "after I sat around and thought about it, then I could identify 'em [both]." Phillips asserted that he never saw the appellant's picture on television or in the newspaper. At the suppression hearing, Phillips further maintained that he could identify both perpetrators even if the police had not shown him the photographs and he proceeded to point out the appellant and Gallaher.

Furthermore, at trial Phillips explained that he had observed both perpetrators in the car lot and viewed them more closely when they entered the office. One of the perpetrators stood beside the victim and the other perpetrator stood beside Phillips. The perpetrator standing near the victim, whom Phillips identified as the appellant, "told Fred that it was a robbery."[4] Phillips stated that he was "certain" of his identification of the appellant and Gallaher from the photographic line-ups. He also contended that no one suggested that he choose a specific photograph. See State v. Howell, 672 S.W.2d 442, 445 (Tenn. Crim. App. 1984). The trial court determined that "police photographic lineup procedure was proper and not suggestive." In light of the foregoing, we conclude that the trial court did not abuse its discretion in denying the appellant's motion to suppress Phillips' pretrial identification of the appellant.

### B. Witness not Disclosed in Discovery

At trial, the State called witness Ronald Austin to testify regarding a conversation he had with the appellant prior to trial. The appellant argues that the trial court "erred in allowing the State to introduce into evidence the testimony of [Austin] who claimed that Appellant made a jailhouse confession." Initially, we note that the appellant provided little citation to the record or to supporting authority. See Tenn. R. App. P. 27(a)(7). Accordingly, the appellant arguably waived this issue. See State v. Killebrew, 760 S.W.2d 228, 231 (Tenn. Crim. App. 1988). Moreover, the appellant failed to object to the testimony of this witness at trial, providing additional support for the premise of waiver.[5] Tenn. R. App. P. 36(a). Nevertheless, this issue is without merit.

At trial, the following colloquy occurred prior to the State calling Ronald Austin to testify:

---

[4] At trial, Phillips claimed that the appellant wore a black coat and stood by the victim and Gallaher wore a green coat and stood beside Phillips. However, the officers testifying at trial agreed that the appellant stood near the victim but asserted that the appellant wore a green jacket and Gallaher wore the black jacket.

[5] In his brief, the appellant contends that he did object to allowing Austin to testify. However, he also notes that

> the transcript does not reflect he objection and [the appellant] is unsure why. [The appellant] would state, that the transcript picks up a discussion about [the appellant] not having had an opportunity to meet with the witness, but the State indicates in their discussion that they are now making the witness available for an interview.

Court: [State], this witness that you plan to call, it is my understanding that [the appellant] has not had an opportunity to interview this witness. It is also my understanding that you have not given this witness any instructions to not talk with [the appellant].

State: I haven't seen or talked to this witness myself.

Court: But basically speaking, you have given [the appellant] this statement that is referred to and that's the information that you have as to what this witness would testify to. Is that correct?

State: That's correct.

Court: [Appellant], at this time I am going to allow you to go back to the jail to talk with this individual.

Initially, we note that both the State and the appellant cite Tennessee Rule of Criminal Procedure 16 as determinative of this issue.[6] Such rule provides:

Upon request of a defendant the state shall permit the defendant to inspect and copy or photograph: . . . the substance of any oral statement which the state intends to offer in evidence at the trial made by the defendant whether before or after arrest in response to interrogations by any person then known to the defendant to be a law-enforcement officer.

Tenn. R. Crim. P. 16(a)(1)(A). However, "[t]he comments to the Rule make no explanation why the revelation of the substance of oral statements is limited to those made during interrogation and not extended to any oral statements made which are incriminating." State v. Balthrop, 752 S.W.2d 104, 108 (Tenn. Crim. App. 1988). Accordingly, because the remarks in question were made by the appellant to a civilian and not to an officer during an interrogation, "they are not excludable because the state did not reveal them." Id.; see also State v. Cyrus Deville Wilson, No. 01C01-9408-CR-00266, 1995 Tenn. Crim. App. LEXIS 892, at *8 (Nashville, Nov. 15, 1995) (concluding that the statement was not subject to disclosure because it was not made to a member of law enforcement). Furthermore, we observe that the dialogue quoted *supra* indicates that the State did reveal Austin's identity and the substance of his testimony prior to his being called as a witness; however, the record is unclear as to when the State made this revelation. "'In this context, it is not the prejudice which resulted from the witnesses' testimony but the prejudice which resulted from the defendant's lack of notice which is relevant to establish prejudice.'" State v. Kendricks, 947 S.W.2d 875, 883 (Tenn. Crim. App. 1996) (quoting State v. Jesse Eugene Harris, No. 88-188-III, 1989 Tenn. Crim. App.

---

[6] Additionally, Tennessee Code Annotated section 40-17-106 (1997) controls the "duty of the district attorney general to endorse on each indictment . . . the names of such witnesses as the district attorney general intends shall be summoned in the cause." However, this duty is directory, not mandatory. State v. Harris, 839 S.W.2d 54, 69 (Tenn. 1992).

LEXIS 449, at *11 (Nashville, June 7, 1989)). Even if the identity of the witness should have been disclosed, the appellant has demonstrated no prejudice resulting from his lack of notice regarding this witness. Id. The trial court determined that the proper remedy for the alleged error was for the appellant to have the opportunity to interview Austin outside of trial prior to the State calling Austin as a witness. The appellant could have requested a continuance, but failed to do so. This issue is without merit.

## C. Video Tape

The appellant raises two closely related complaints regarding the admission of the video tape of the robbery and shooting. The appellant complains that the trial court erred in allowing witnesses to testify that they recognized the appellant's voice and further erred in allowing the State to introduce into evidence at trial the purported transcript of the tape of the alleged crime. At the outset, we note that trial courts are accorded broad discretion in ruling upon the admissibility of evidence; we shall not overturn such rulings absent an abuse of that discretion. State v. Dellinger, 79 S.W.3d 458, 487 (Tenn. 2002).

### 1. Voice Identification

As to the issue of voice identification, the appellant specifically argues that the testimony of witnesses who recognized the appellant's voice should have been inadmissible because the State failed to lay a proper foundation. "The only foundation that was laid by the State in the recognition of these voices was that [the witnesses] knew [the appellant] through the course of their work." First, we observe that the appellant failed to cite to any relevant authority in support of this issue. See Tenn. R. App. P. 27(a)(7). Thus, the appellant has waived this issue. See State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Regardless, the appellant is not entitled to relief.

Tennessee Rule of Evidence 901 governs the authentication of evidence. Specifically regarding voice identification, the rule provides that authentication may be made by "[i]dentification of a voice, whether heard firsthand or through mechanical or electronic transmission or recording, by opinion based upon hearing the voice at any time under circumstances connecting it with the alleged speaker." Tenn. R. Evid. 901(b)(5). Specifically, one authority has noted that

> if the witness has, at the time of testifying, adequate familiarity with the speaker's voice, he or she may opine whether the disputed testimony is the alleged speaker's voice, Rule 901(b)(5). Familiarity can be gained in a relatively short period of time, and as the result of conversations occurring before or after the conversation that was identified.

Neil P. Cohen, et al., Tennessee Law of Evidence, § 9.01[7], at 9-11 (LEXIS Publishing, 4th ed. 2000). Additionally, in State v. Jones, 598 S.W.2d 209, 223 (Tenn. 1980), our supreme court held that

> tape recordings and compared transcripts are admissible and may be presented in evidence by any witness who was present during their recording or who monitored the conversations, if he was so situated

-12-

and circumstanced that he was in a position to identify the declarant with certainty, and provided his testimony in whole, or in part, comports with other rules of evidence.

In the instant case, the appellant's voice was identified by Assistant Chief Queener, Wilson, Billy Paul Brown, Douglas, and Officer Whitt. The appellant objected to the voice identification made by Assistant Chief Queener, but failed to object to the voice identifications made by the other witnesses. All of the witnesses stated that they could identify the voices of the appellant and Gallaher because they had known both men for many years. See State v. Leonard Edward Baugh, Jr., No. M2000-00477-CCA-R3-CD, 2001 Tenn. Crim. App. LEXIS 415, at *29 (Nashville, June 1, 2001), perm. to appeal denied, (Tenn. 2001). Specifically, Assistant Chief Queener testified that he had known the appellant "[m]ost of his young adult life as a juvenile up," and he further asserted that he had conversations with the appellant prior to the February 17, 1999, offense. Assistant Chief Queener recognized the appellant's voice on the tape as being the voice of one of the perpetrators. Wilson maintained that he knew Gallaher and the appellant because they had been to his house on several occasions and they typically referred to each other as "cuz." Due to his familiarity with their voices, Wilson identified the voices of Gallaher and the appellant on the tape. Billy Paul Brown testified that Gallaher and the appellant were his cousins and he recognized their voices and faces on the tape. Douglas asserted that he recognized the appellant's voice on the tape because he was familiar with the appellant's voice. Particularly, Douglas explained that "[i]t had been a while but I had talked to [the appellant]. But the day that . . . I went to the Detention Facility to interview him, I was absolutely positive that it was his voice." Additionally, Officer Whitt testified that he knew the appellant and Gallaher well and recognized their voices on the tape. "For authentication purposes, voice identification by a witness need not be certain; it is sufficient if the witness thinks he can identify the voice and express his opinion." Stroup v. State, 552 S.W.2d 418, 420 (Tenn. Crim. App. 1977). Accordingly, we find no error. See State v. Steven Radley, No. 01C01-9311-CC-00382, 1994 Tenn. Crim. App. LEXIS 438, at *10 (Nashville, July 14, 1994).

2. Transcript

The appellant also complains that the trial court erred in allowing the State to introduce into evidence at trial the purported transcript of the tape of the alleged crime.[7] As we noted, Jones, 598 S.W.2d at 223, provides the standard for the admission of a transcript. Assistant Chief Queener testified that he and Detective Hedden "listened to the tape and transcribed in words and the person that was talking and we put these in words on paper." However, the proof clearly reflects that Assistant Chief Queener was not present during the recording of the tape nor did he monitor the conversation as it was recorded. Accordingly, the trial court erred in admitting the transcript.

Moreover, the appellant additionally complains that the trial court failed to give a limiting instruction following the admission of the transcript. The record does not reflect that the

---

[7] The appellant did object to the admission of the transcript at trial; however, the record is unclear as to the exact basis of the appellant's objection.

appellant ever requested that a limiting instruction be given regarding the use of the transcript. Because of the appellant's failure to request such an instruction, the appellant has waived this argument. See Tenn. R. App. P. 36(a); State v. William Lewis Houston, No. M1999-01430-CCA-R3-CD, 2000 Tenn. Crim. App. LEXIS 936, at *23 (Nashville, Dec. 7, 2000). Nevertheless, we find it important to note that, "[i]t is well-settled in Tennessee that a transcript of a tape may be given to a jury where the jury is instructed that the tape, and not the transcript is the actual evidence." State v. Barnard, 899 S.W.2d 617, 623-24 (Tenn. Crim. App. 1994). Accordingly, the trial court should have instructed the jury that the tape itself was the evidence to be considered, not the transcript. However, even if the trial court erred by admitting the transcript, in light of the remaining overwhelming proof against the appellant, namely the video tape itself and the positive identification by Phillips, we conclude that this error was harmless. Tenn. R. App. P. 36(b).

### D. Lesser-Included Offense

Next, the appellant contends that the trial court erred in failing to charge the jury with the lesser-included offense of facilitation of first degree murder committed in the perpetration of an aggravated robbery (hereinafter "facilitation of felony murder"). The trial court instructed the jury on the charged offense of first degree murder committed in the perpetration of an aggravated robbery and on the lesser-included offenses of second degree murder, criminally negligent homicide, and reckless homicide. Tennessee Code Annotated section 40-18-110 (1997) mandates that a trial court must charge the jury as to the law of each offense which is "included" in an indictment, regardless of a defendant's request for such an instruction. Whether a lesser-included offense must be charged in a jury instruction is a two-part inquiry.

> First, the trial court must determine whether any evidence exists that reasonable minds could accept as to the lesser-included offense. In making this determination, the trial court must view the evidence liberally in the light most favorable to the existence of the lesser-included offense without making any judgments on the credibility of such evidence. Second, the trial court must determine if the evidence, viewed in this light, is legally sufficient to support a conviction for the lesser-included offense.

State v. Burns, 6 S.W.3d 453, 469 (Tenn. 1999). Currently, Burns, 6 S.W.3d at 466-67, is the controlling authority for determining when an offense may be considered a lesser-included offense of an indicted offense. Again, the appellant contends that facilitation of felony murder is a lesser-included offense of first degree murder committed in the perpetration of an aggravated robbery. "A person is criminally responsible for the facilitation of a felony if, knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility under § 39-11-402(2), the person knowingly furnishes substantial assistance in the commission of the felony." Tenn. Code Ann. § 39-11-403(a) (1997). Applying the criteria set forth in Burns, our supreme court recently noted that, pursuant to part (c) of the Burns test, facilitation of felony murder is a lesser-included offense of first degree murder committed in the perpetration of a felony, which felony in the instant case is aggravated robbery. State v. Ely, 48 S.W.3d 710, 720 (Tenn. 2001). Thus, we must proceed to the second part of our inquiry.

It is well-settled that "the mere existence of a lesser offense to a charged offense is not sufficient alone to warrant a charge on that offense. Whether or not a particular lesser-included offense should be charged to the jury depends on whether proof in the record would support the lesser charge." Burns, 6 S.W.3d at 468. Our supreme court also recently noted that "[t]he general rule for lesser offenses under part (a) of the Burns test does not extend to lesser offenses under part (c) of the test." State v. Allen, 69 S.W.3d 181, 188 (Tenn. 2002). Accordingly, establishing proof sufficient to convict under the greater offense will not necessarily prove the lesser offenses, including facilitation, enumerated in part (c) of the test. Id.

The facts of the instant case closely resemble those in Ely. In Ely, our supreme court concluded:

> While there was some question as to whether it was Carden or Ely who actually killed the victim, the evidence was clear that the commission of the underlying felony of robbery was a joint undertaking. Ely's defense was that he was not present; therefore, he was either guilty of some degree of homicide or wholly innocent of any wrongdoing. . . . [Accordingly,] we find that no reasonable juror could have believed that although Ely was present, knew that Carden intended to commit the robbery, and furnished substantial assistance in the commission of the robbery, he nevertheless did not intend "to promote or assist the commission of the offense or to benefit in the proceeds or results of the offense." Therefore, no instruction on the lesser-included offense of facilitation was warranted.

48 S.W.3d at 724. In the instant case, the proof the State adduced at trial established that the appellant was active in the robbery, going so far as to inform the victim that he was being robbed. The appellant was armed and assisted Gallaher in the commission of the robbery. In defense of the charges, the appellant relied solely upon a theory of mistaken identity. Consequently, as in Ely, the appellant "was either guilty of some degree of homicide or wholly innocent of any wrongdoing." Id. Based upon the proof at trial, the trial court was not required to instruct the jury on the lesser-included offense of facilitation. This issue is without merit.

## E. Sufficiency of the Evidence

Finally, the appellant contests the sufficiency of the evidence supporting his conviction. In Tennessee, appellate courts accord considerable weight to the verdict of a jury in a criminal trial. In essence, a jury conviction removes the presumption of the defendant's innocence and replaces it with one of guilt, so that the appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The appellant must establish that no "reasonable trier of fact" could have found the essential elements of the offense beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); Tenn. R. App. P. 13(e).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. State v. Williams, 657

S.W.2d 405, 410 (Tenn. 1983). In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts. State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

The indictment against the appellant charged him with killing Fred Brown in the perpetration of an aggravated robbery. See Tenn. Code Ann. § 39-13-202(a)(2) (1997). Aggravated robbery is robbery "[a]ccomplished with a deadly weapon or by display of any article used or fashioned to led the victim to reasonably believe it to be a deadly weapon; or [w]here the victim suffers serious bodily injury." Tenn. Code Ann. § 39-13-402(a)(1) and (2) (1997). "Robbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a) (1997).

> The appellant specifically argues that the State only proved that the victim was killed by a blunt blow to the head, the blunt object used was never identified, it was never testified or proven that the Appellant struck the victim and further the only item that conclusively places him at the scene is the videotape and the ancillary testimony interpreting him as being on the videotape by non experts giving expert testimony.

At trial, the appellant was positively identified by Phillips as one of the perpetrators who entered the office of F&G Auto Sales. Phillips asserted that the appellant approached the victim and informed him that they were committing a robbery. Gallaher struck Phillips in the head, rendering him unconscious. When Phillips regained consciousness, the perpetrators were gone and the victim was lying prone on the floor. Phillips freed himself from the duct tape binding his arms and went to the aid of his boss. The victim instructed Phillips to call 911 because he had been shot by the perpetrators. The autopsy revealed that the victim died as a result of massive facial injuries, but had those injuries not been fatal, one of the gunshot wounds likely would have been. Dr. Blake opined that the fatal facial injuries occurred just prior to the near fatal gunshot wound.

Assistant Chief Queener, Douglas, Billy Paul Brown, Wilson, and Officer Whitt all positively identified the appellant as one of the perpetrators shown on the video tape. The appellant entered the office first and approached the victim. Testimony regarding the video indicates that a struggle occurred as the victim resisted the attempts to take his money. The money typically kept in the appellant's shirt pocket was never discovered. Additionally, the perpetrators took the video tape from the security camera. Furthermore, the audio portion of the video tape recorded the sound of the appellant's voice and the sound of gunshots. The victim was not injured prior to the encounter with the appellant and Gallaher. We conclude that this evidence is more than sufficient to sustain the appellant's conviction.

### III.  Conclusion
Finding no reversible error, we affirm the judgment of the trial court.


_____
_____NORMA McGEE OGLE, JUDGE